Irving H. Saypol, J.
The defendants’ motion is for an order consolidating for trial two separate actions and a third article 78 CPLR special proceeding. It is opposed by the petitioner *43 in the special proceeding, Herbert J. Miller, who alternatively asks that the motion be denied or, if not, then for permission to discontinue his proceeding. Directly opposed to consolidation and cross-moving for summary judgment (CPLR 3212, subds. [b], [c]) on their second cause of action in their complaint in Action No. 2 are the coplaintiffs Anita Margulis and the Association of Old Forest Hills, Inc. Coincidentally, they seek dismissal of the several affirmative defenses pleaded in the separate answers of the defendants John V. Lindsay and Simeon Colar, each sued individually and representatively, respectively as Mayor of New York City and as Chairman of the New York City Housing Authority.
The defendants’ motion is denied. That disposes of Assemblyman Miller’s opposition. The Margulis-Association cross motion for summary judgment on the second cause of action is granted, their first cause of action is severed, and the affirmative defenses are dismissed.
It is decided that the defendants are wrongfully effectuating the 1970 version of the original 1966 Forest Hills housing project: Commissioner Colar in actual misperformance, Mayor Lindsay in permitting it without the preliminary which the law mandates — duly called and duly held public hearing. Euphemistically, that defective project is but metamorphosis of the original, in no way resembling it, neither in form, appearance nor structure.
The plaintiffs shall have judgment on their second cause of action for the relief demanded in their complaint and it is declared that the defendants are proceeding illegally in the execution of the project described in paragraph 5 of the complaint, the so-called Forest Hills project. It is further declared that the defendants may not continue with the effectuation of that project until it has been duly presented and considered and approved after the public hearing or hearings mandated in law.
According to the pleadings and the exhibits, the motion papers and accompanying memoranda, a $29,980,000 plan and project, of which at least $2,000,000 will be New York City moneys, is under construction by the New York City Housing Authority. Local administrative and legislative action is controlled by subdivisions 1 and 2 of section 150 of the Public Housing Law and sections 67, 197, 198 and 199 of the New York City Charter.
The public policy of the State in section 2 of the Public Housing Law, complementing article XVIII of the New York State Constitution, declares the need for slum elimination and the correction of unhealthy and uncomfortable dwelling facilities and *44 provision for suitable accommodations for persons and families of low income.
Section 3 of the Public Housing Law recites the following definitions:
“ 13. The term ‘ plan ’ means a plan or undertaking for the clearance, replanning and reconstruction or rehabilitation of a substandard and insanitary area or areas and for recreational and other facilities incidental or appurtenant thereto to effectuate the purposes of article eighteen of the constitution or any other provision of the constitution delegating any similar power or providing homes for persons of low income.
“ 14. The term ‘ project ’ means a specific work or improvement to effectuate all or any part of a plan. The term shall include the lands, buildings or any dwelling unit therein, and improvements acquired, owned, constructed, managed or operated hereunder, to provide dwelling accommodations for persons of low income, and such stores, offices and other nonhousing facilities as well as social, recreational or communal facilities, as may be deemed by the authority or municipality to be incidental or appurtenant to a project. Subject to the provisions of article eighteen of the constitution with respect to state projects, such dwelling accommodations may be provided in any section of the municipality, whether or not such section has insanitary or substandard housing conditions. A project may be a federal project, a state project, a municipal project or, subject to the limitations contained in section seventy-five of this chapter, any combination of these.”
Section 150 of the Public Housing Law is as follows:
“ § 150. Approval of plan and projects.
“ 1. The prior approval of the local legislative body and of the planning commission, if any, in the manner hereinafter provided in subdivision two of this section, shall be requisite to the final adoption or approval by an authority or municipality of a plan or project. Where a master plan exists such plan shall conform to such master plan, except (as such master plan may be changed pursuant to the procedure prescribed by law. (Emphasis supplied.)
‘ ‘ 2. Every plan or project proposed by an authority or municipality shall be submitted by the authority or the municipality to the planning commission, if any, for approval. The planning commission, after• considering the plan or project may:
‘ ‘ a. Issue a report of unqualified approval; or
“ b. Issue a report of conditional or qualified approval; or
‘ ‘ c. Issue a report disapproving thereof.
*45 “ The plan or project shall be submitted by the authority or municipality, together with the report of the planning commission, to the local legislative body for its approval. If the planning commission shall have issued a report of unqualified approval, the plan or project may be approved in accordance with the report of the planning commission by a majority vote of the local legislative body. If the planning commission shall have issued a report disapproving thereof, or shall have issued a report of conditional or qualified approval, or shall have failed to make its report within six weeks of the submission of the plan or project by the authority or municipality to the planning commission, the local legislative body may, nevertheless, approve the plan or project but only by a three-fourths vote.”
Subdivisions 3 and 4 of section 67 of the New York City Charter provide:
“ § 67. Responsibilities of the board [Board of Estimate of the City of New York].— The board shall exercise the powers and perform the duties imposed upon it by this charter, and shall: * * *
“ 3. Make recommendations to the mayor or the council in regard to matters of city policy whenever requested or on its own initiative.
“ 4. Hold public hearings on any such matter of city policy or other matters within the scope of its responsibilities whenever requested by the mayor or required to do so by this charter or other provision of law or whenever in its judgment the public interest will be benefited thereby.”
Sections 197 and 198 of the New York City Charter provide:
“ § 197. Master plan of the city.— a. The city planning commission shall prepare and adopt, in one or more parts, and from time to time modify a master plan for the physical development of the city, which shall provide for the improvement of the city and its future growth and afford adequate and appropriate facilities for the housing, business, industry, transportation, distribution, recreation, comfort, convenience, health and welfare of its population.
“ b. Before adopting the master plan or any part or modification thereof, the commission shall hold a public bearing or hearings thereon, notice of which shall be published in the City Record at least ten days prior thereto.
‘ ‘ c. The master plan and all modifications thereof shall be on file in the office of the department of city planning and certified copies thereof shall be filed in the offices of the city clerk and of each borough president. Upon the adoption of any *46 modification of or in addition to the master plan, it shall be published in the City Record.” (Emphasis supplied.)
“ § 198. City map.— a. The city map, as the same shall exist at the time when this charter goes into effect, is hereby continued.
“ b. The director of city planning shall be the custodian of the city map, and it shall be his duty to complete and maintain the same and to register thereon all changes resulting from action authorized by law.
‘‘ c. The city map shall be' on file in the office of the department of city planning, and certified copies thereof and of all changes thereto shall be filed in the offices of the corporation counsel, the city clerk and of the borough president of the borough in which the land shown on the map is located and in the office in which conveyances of real estate are required to be recorded in the county in which the land shown on the map is located.”
Summarized, it is the law that the housing plan and project involved here under the authority of section 150 of the Public Housing Law, as a change of New York City’s master plan, must be preceded by a Planning Commission public hearing or hearings on at least 10 days’ published notice (New York City Charter, § 197, subd. b), and a similar procedure — notice and public hearing — is mandated with respect to any improvement or project affecting the master plan or the city map (New York City Charter, § 199).
The second cause of action, realleging paragraph 19 of the first cause, reads as follows:
“ 19. For the first time, in late 1971, Plaintiffs were authoritatively informed that although said submission to the City Planning Commission stated in November and December 1966, that there were to be
1 — 22 story
3 —12 story
3 —10 story buildings •
on January 8, 1967, the Defendants caused to be submitted to HUD a project design of 4 15-story and 2 14-story buildings; that thereafter the Defendants caused to be submitted to HUD a plan with 15-story and 2- and 3-story buildings; that thereafter, a new architect acting on behalf of Defendants, submitted to HUD a plan with five 18-story buildings, and that finally there has been submitted to HUD, and Defendants are proceeding to build, a scheme for three 24-story buildings, one 2-story *47 £ community center ’ and one 1-story ‘ early childhood center ’ ”; and then continues in paragraphs 25 and 26:
" 25. The radical revisions in the size, location and capacity of the buildings in the project since the submission to the City Planning Commission and the Board of Estimate, as aforesaid, require that new approvals of these agencies be obtained, pursuant to § 150 of the Public Housing Law, since the 1966 approvals were not to the £ project ’ as defined in said law, which Defendants are causing the City and Authority to proceed to erect.
" 26. Defendants know that such approvals are now required but are proceeding to cause the construction of said project in violation of law, nevertheless in aid of their own personal political objectives in contravention to their duty as public officers.”
The calendar of the Board of Estimate of the City of New York for Friday, December 9, 1966, includes at page 116 the following pertinent parts of No. 146:
“ communication dated December 2, 1966, from the General Manager, New York City Housing Authority, requesting approval of a Plan and Project for a Federally-aided public housing project tentatively designated as the 108th Street-62nd Drive Area, Borough of Queens, to be located within the area bounded generally by Horace Harding Expressway, Colonial Avenue, 62nd Drive and 108th Street.
" The proposed public housing development will be integrated in accordance with the positive integration policy of the Authority.
" Also submitted was a form of resolution approving the Plan and Project and the following report of the City Planning Commission:
"report of the City Planning Commission (CP-19606, dated December 2, 1966) stating that the project site is being substituted by the New York City Housing Authority for the Lewis Avenue-lOOth Street Area site which was the subject of a favorable report by the City Planning Commission (CP-19402, dated June 21, 1966). £ £ PLAN AND PROJECT.
££ That proposed Plan and Project provides for the development of approximately 828 dwelling units on a vacant site of 368,700 square feet or 8.46 acres in area. The Housing Authority advises that the project will probably comprise one 22-story building, three 12-story buildings and three 10-story buildings. The buildings would cover 16.38 per cent of the site and have a floor area ratio of approximately 2.09. The population density *48 is estimated to be 98 families or 344 persons per acre. Approximately 30 per cent of the apartments are to be specifically designed for the elderly. * * *
“ On November 30, 1966 (Cal. No. 47), the City Planning Commission held a public hearing on this project.
“ There were about 50 speakers at the hearing; 30 in favor and 20 in opposition. There were also 59 persons who did not speak but requested to be recorded in opposition. A petition in opposition was submitted at the hearing.
“ Speaking in opposition were a number of residents and home owners in the area surrounding the proposed housing site; an apartment house owner in the area; a State assemblyman; a representative of the local Community Planning Board and representatives of local civic organizations, including Annadale Park Civic Association, Association of Old Forest Hills and North Forest Hills Association. Several telegrams, both for and against were received.
“ Speaking in favor of the project were residents of the surrounding area as well as other sections of Queens, representatives of the New York City Commission on Human Rights, National Association for the Advancement of Colored People, New York Urban League, Americans for Democratic Action, American Jewish Congress, Catholic Inter-racial Council, Metropolitan Council on Housing, as well as other civil rights and housing organizations.
“ Those who objected to this project generally based their opposition on the contention that the area was congested, schools were overcrowded, transportation facilities were overtaxed and that the site was unsuitable because poor foundation conditions would result in excessive development costs. It was also contended that the site should be used for a park or for a Junior High School. Fears were expressed that the persons brought into this area as a result of construction of the proposed project would cause unsafe conditions in the streets.
“ Those who supported the project called attention to the urgent need for decent housing accommodations for low-income people and for the development of such accommodations in locations which could offer hope to low-income families of all racial backgrounds, to escape from segregated ghetto areas and enter into a fuller and more satisfactory community life with opportunities for social and economic betterment. They contended that low-income public-housing-project families were not people of moral delinquency or criminal tendencies, that they were decent, normal families, and that the integration of these *49 families in sound neighborhood would not only be of benefit to the low-income families who move into the neighborhood, but would also provide an opportunity for broader social contact and understanding among all people of the community. ‘ ‘ DETERMINATION OF THE COMMISSION. * * *
“ This site was submitted by the Housing Authority after it was found that a site we approved for housing on June 21, 1966 at Lewis Avenue and 100th Street in Corona was needed for a high school. After a discussion of this matter before the Board of Estimate on October 27,1966 the Mayor stated, ‘ After an exhaustive study and analysis and after conferring with Borough President Cariello and community leaders and various groups, we have concluded that Lewis Avenue is the only available site at which the entire high school complex could be constructed and that there is another equally desirable site in the same area on which low rent housing can be placed.’
‘ ‘ The new site for low rent housing is a vacant parcel a few blocks south of the Lewis Avenue site near Flushing Meadow Park located at 108th Street, 62nd Drive and 62nd Avenue.
# # #
“ That public hearing lasted 5% hours. The Commission discussed this matter at a special Executive Session on the same day. The staff prepared additional analyses and information for the Commission’s review and the project was again discussed with the Commission on December 1,1966. Following that meeting a draft report was prepared which was discussed and amended on December 2nd. * * *
“ The Commission finds that the Plan and Project for the proposed development 108th Street-62nd Drive Area conform to the Commission’s general plan for the City’s future growth and the relevant parts of the Master Plan so far as adopted.
“ The City Planning Commission approves, pursuant to Section 150 of the New York State Public Housing Law, the Plan and Project for the public housing project hereinbefore described and tentatively designated as 108th Street-62nd Drive Area, Borough of Queens.
“ For consideration.
“ (See Cal. No. 29) ”.
The essence of the plaintiffs’ grievance — from the supporting affidavit and their memorandum of law — it can be repeated that the project under way is metamorphosis, unrecognizable from the originally approved project of December 9, 1966.
The defendants state the following chronology in their memorandum :
*50 “ In October, 1966 at a Board of Estimate meeting the Mayor agreed to the switch of sites for the high school and housing ■ project. On November 9,1966 the Authority submitted its plan and project to the City Planning Commission (hereinafter CPC). This was before an architect had been hired, engineering studies made, plans drawn or soil tests made. It was a proposal to build a housing project on a given land site in accordance with the zoning analysis and limitations then applicable to the site. Tentatively, a projected number of buildings were stated as ‘ probable ’, with indicated heights — all to provide 828 housing units.
" On November 30, 1966 the CPC held a public hearing on the project. The CPC approved the project by a 7 to 0 vote on December 2, 1966 and submitted it to the Board of Estimate.
“ On December 9, 1966 the Board of Estimate approved the project by a vote of 22 to 0. The project and plan called for a 1 probable ’ 828 units in seven buildings (one 22-story building, three .12-story buildings and three 10-story buildings).
“ On May 29, 1967 * * * NYCHA advised the CPC of revision of plans. It proposed to change the number of units from 828 to 848 and to provide for four 16-story buildings and two 14-story buildings. By a letter dated June 8,1967 the CPC advised the NYCHA that the changes had no effect on its prior approval. * * *
“ On November 14, 1967 Architect Ulrich Franzen was designated as the architect for the project. * * * Architect Fran-zen submitted a design early in 1969 composed of two 18-story buildings, one 23-story building and a series of row buildings * * * Architect Samuel Paul replaced Mr. Franzen on September 12, 1969 * * *
“ On August 20, 1970 architect submitted the Phase II (preliminary estimates) plan of design * * * This design has been ultimately approved by HUD and consists of three 24-story buildings containing 840 units, of which 341, or 40% are slated for the elderly, plus a two-story community center and a possible one-story .early childhood center.”
From an original 1966 plan of seven buildings, the tallest 22 stories, after obligatory public hearing, on notice, there have been four successive changes up to the present plan under way of three 24-story buildings, without any hearing.
"When a public hearing is directed by the law, it requires such a hearing not in the technical sense, but as the essence of due process; it must be fair and open, essential alike to the legal validity of the administrative regulation and the mainte *51 nanqe of public confidence in the value and soundness of this important governmental process (Morgan v. United States, 304 U. S. 1, 14-15, 19). There (p. 15) Chief Justice Hughes for a majority quoted: “ Such a hearing has been described as an ‘ inexorable safeguard.’ ”
“ Under our democratic form of government a public hearing is, when required by statute, an inalienable right ” (Matter of Stanford v. Summers, 157 Misc. 698, 701, affd. 247 App. Div. 627).
1 ‘ A property owner who was affected * * * should be given full information * * * so that he would be able to make up his mind whether he wanted to object to the improvement. If one was compelled to wait until the meeting for such information, he would not have sufficient time to prepare his protest, or to consult with his neighbors * * * The property owner [must know] the nature and extent of the proposed improvement.” (Matter of Sobol v. Common Council, 233 App. Div. 158, 160.)
Matter of Tinsley v. Monserrat (26 N Y 2d 110, revg. 33 A D 2d 316, which revd. 61 Misc 2d 599) dealt with a proposed plan for the creation of a school district. Special Term rejected the final plan adopted and announced without required public hearings, on the grounds that the original plan per se was illegal and in any event because the final plan bore no resemblance to the proposed plan. Presiding Justice Stevens, dissenting from the reversal of Special Term (33 A D 2d 316, 323) and voting to affirm, reasoned that knowingly presenting a tentative plan which is violative of the law is tantamount to the presentation of no plan at all. The Court of Appeals per Chief Judge Funo (26 N Y 2d 110) stated its agreement with Presiding Justice Steveets ’ conclusion that hearings on an illegal plan constituted ‘ ‘ no minor deviation ’ ’, directed the preparation of a new plan and a public hearing thereon, and continued (pp. 113-114): “It was the legislative design that the local community be heard on the plan under consideration, which was possible of acceptance. Moreover, the Education Law unequivocally places the responsibility on the board, not on the members of the public attending the hearings to formulate the initial proposal for such valid plan and to hold public hearings on that plan prior to adoption. Concededly, no hearings were held on the plan which the board thereafter announced and adopted.
“ This is not to say that if, as a result of the hearings held, the board decides to modify its original valid proposal, it must resubmit the plan for new and further hearings. The plan *52 officially adopted, however, must be derived from, and bear some reasonable resemblance to, the one initially proposed. In the present case, there was no such relationship between the plan initially published, providing for an impermissible and illegal division of the Borough of Manhattan into six school districts, and the radically different plan ultimately adopted, calling for the creation of five districts.”
While the original plan was legally adopted in 1966, the marked changes in design, number and juxtaposition of structures in the present fourth or fifth plan of 1970 — from seven to three buildings, from one tallest of 22 stories to three of 24 stories — evolving internally in the defendants, without the required public hearings, demand judicial condemnation. Of the affirmative defenses which are dismissed, but two to the same effect require comment or ruling: the asserted lack of standing to sue in the plaintiffs is raised as the second defense in Mayor Lindsay’s answer and the fourth defense in the answer of Commissioner Colar. Margulis meets the issue, her coplaintiff remains silent. Margulis alleges and is not disputed of her qualification as a taxpayer (General Municipal Law, § 51). Rejecting the defense as to her, in the circumstances of the present decision, leaves the question of her coplaintiffs’ standing academic, subject to consideration in connection with the first severed cause of action. As to the individual plaintiff, the claimed and well publicized disadvantages and the disruptions to the community and its interest are an adjunct of the property interest that the individual has in the community. The complaint alleges official illegality, which permits a taxpayers’ action to 1 ‘ frustrate or undo acts of officials which are # * * beyond their power ” (Blanshard v. City of New York, 141 Misc. 609, 618 [Shientag, J.], affd. 235 App. Div. 714, affd. 262 N. Y. 5).